IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| ZECHARIAH QUINTIN GABLE, | ) | CIVIL ACTION NO. 9:14-2820-BHH-BM |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

The Plaintiff filed the complaint in this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner wherein he was denied disability benefits. This case was referred to the undersigned for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a)(D.S.C.).

Plaintiff received Supplemental Security Income (SSI) as a child based on the rules applicable for determining disability as a child. Pursuant to applicable law, the Social Security Administration (SSA) redetermined Plaintiff's eligibility for disability benefits under the rules for determining disability in adults when Plaintiff turned eighteen years old in January 2010. Plaintiff was found to not meet the disability standard for adults, and was found no longer disabled as of July 1, 2010. Plaintiff's claim was denied upon reconsideration. Plaintiff then requested a hearing before an Administrative Law Judge (ALJ), which was held on January 2, 2013. (R.pp. 25-43). The ALJ thereafter denied Plaintiff's claim in a decision issued January 25, 2013 (R.pp. 12-19). The Appeals Council denied Plaintiff's request for a review of the ALJ's decision, thereby making the determination of the ALJ the final decision of the Commissioner. (R.pp. 1-4).

Plaintiff then filed this action in United States District Court. Plaintiff asserts that there is not substantial evidence to support the ALJ's decision, and that the decision should be reversed and remanded for further consideration, or for an outright award of benefits. The Commissioner contends that the decision to deny benefits is supported by substantial evidence, and that Plaintiff was properly found not to be disabled.

<u>**Scope of review**</u>

Under 42 U.S.C. § 405(g), the Court's scope of review is limited to (1) whether the Commissioner's decision is supported by substantial evidence, and (2) whether the ultimate conclusions reached by the Commissioner are legally correct under controlling law. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990); <u>Richardson v. Califano</u>, 574 F.2d 802, 803 (4th Cir. 1978); <u>Myers v. Califano</u>, 611 F.2d 980, 982-983 (4th Cir. 1980). If the record contains substantial evidence to support the Commissioner's decision, it is the court's duty to affirm the decision. Substantial evidence has been defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. **If there is evidence to justify refusal to direct a verdict were the case before a jury, then there is "substantial evidence."** [emphasis added].

<u>Hays</u>, 907 F.2d at 1456 (citing <u>Laws v. Celebrezze</u>, 368 F.2d 640 (4th Cir. 1966)).

The Court lacks the authority to substitute its own judgment for that of the Commissioner. <u>Laws</u>, 368 F.2d at 642. "[T]he language of [405(g)] precludes a de novo judicial proceeding and requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by substantial evidence." <u>Blalock v. Richardson</u>, 483 F.2d 773, 775 (4th Cir. 1972).



2

## Case History

Plaintiff was eighteen years old on his redetermination date, and has a limited education. (R.pp. 14, 18, 28, 175). In order to be considered "disabled" within the meaning of the Social Security Act, Plaintiff must show that he has an impairment or combination of impairments which prevent him from engaging in all substantial gainful activity for which he is qualified by his age, education, experience, and functional capacity, and which has lasted or could reasonably be expected to last for a continuous period of not less than twelve months.[1]

After a review of the evidence and testimony in the case, the ALJ determined that, although Plaintiff does suffer from the "severe" impairments[2] of attention deficit hyperactivity disorder (ADHD), a learning disorder, an anxiety disorder, and an impulse control disorder (R.p. 14), he nevertheless retained the residual functional capacity (RFC) for a full range of work at all exertional levels with the nonexertional limitations of simple, routine tasks; no reading or writing beyond the unskilled level; a supervised environment; and no required interaction with the public or team-type interaction with co-workers (R.p. 15). At step four, the ALJ found that Plaintiff was

---

[1]Although there is a five-step sequential evaluation process for determining whether an individual age 18 or older is disabled, see 20 C.F.R. § 416.920(b)-(g), the first step (a determination of whether an individual is engaging in substantial gainful activity) is not used for redetermining disability at age 18. See 20 C.F.R. 416.987(b). Further, medical improvement is not a factor for consideration since the concept of redetermination is to treat the transition to adult SSI as a new application. See 20 C.F.R. § 416.987(b) ("[W]e will not use the rules in § 416.994 for determining whether disability continues."); 42 U.S.C. § 1382c(a)(3)(H).

[2]An impairment is "severe" if it significantly limits a claimant's physical or mental ability to do basic work activities. See 20 C.F.R. § 404.1521(a); Bowen v. Yuckert, 482 U.S. 137, 140–142 (1987).



3

unable to perform his past relevant work as a cleaner. (R.p. 18).[3] The ALJ obtained testimony from a vocational expert (VE) and found at step five that Plaintiff could perform jobs existing in significant numbers in the national economy, and was therefore not disabled during the time period at issue. (R.pp. 18-19).

Plaintiff asserts that in reaching this decision, the ALJ erred in finding that his impairments did not meet or medically equal an impairment rule from the Listings of Impairments;[4] in holding that his statements about the intensity, persistence, or limiting effects of his symptoms were not credible; and by giving improper weight to the VE's opinion and testimony. However, after careful review and consideration of the evidence and arguments presented, the undersigned finds and concludes for the reasons set forth hereinbelow that there is substantial evidence to support the decision of the Commissioner, and that the decision should therefore be affirmed. Laws, 368 F.2d 640 [Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion"].

### Medical Evidence/School Records

Plaintiff was placed in special education classes based on an emotional disability in 2002, at which time he was in the fourth grade. (R.pp. 437-452). Records from Lexington County Mental Health Center (Lexington MHC) in March 2008 (when Plaintiff was in the eighth grade) indicate diagnoses/impressions of ADHD, combined type; history of anxiety disorder, not otherwise

---

[3]The record reflects that Plaintiff worked at a fast food restaurant for a period of time.

[4]In the Listings of Impairments, "[e]ach impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results." Sullivan v. Zebley, 493 U.S. 521, 530 (1990). A claimant is presumed to be disabled if his or her impairment meets or is medically equivalent to the criteria of an impairment set forth in the Listings. See 20 C.F.R. § 416.925.



4

specified; history of disruptive behavior disorder, not otherwise specified; and school failure. It was noted that Plaintiff had run out of his medications approximately six to eight weeks prior to the appointment and had been failing several school subjects since then. Vyvanse and Seroquel were prescribed. Plaintiff's GAF was assessed as 60.[5] (R.pp. 288-289). At followup appointments in May, July, October, and November 2008, and in January and April 2009, Plaintiff's GAF assessments ranged from 50 to 60. (R.pp. 290-301). In July 2008, Plaintiff had been more impulsive when he was working at Burger King, but it was noted that he was not taking his medications and refused to do so until school began again. (R.pp. 292-293). However, Plaintiff was doing very well in November 2008, when he reportedly was taking his medications. (R.p. 296). On April 17, 2009, Plaintiff was noted to have been expelled from school due to mood lability, but again had been noncompliant with his medications. He had significant improvement when he restarted his medications. (R.p. 300).

On April 27, 2009, Ms. Holley Markley, Plaintiff's Special Education Teacher for ninth grade, completed a questionnaire in which she noted that Plaintiff had no problem in moving about and manipulating objects, and (with only a few exceptions) had no problem to only a slight problem in the areas of acquiring and using information, attending and completing tasks, and interacting and relating with others. The exceptions were that Plaintiff was rated as having an obvious problem in comprehending and doing math problems, working at a reasonable pace/finishing on time, and asking permission appropriately, and he had a serious problem in expressing ideas in

---

[5]"Clinicians use a GAF [Global Assessment of Functioning] to rate the psychological, social, and occupational functioning of a patient." <u>Morgan v. Commissioner of Soc. Sec. Admin.</u>, 169 F.3d 595, 597 n.1 (9th Cir. 1999). A GAF score between 51 to 60 indicates "moderate symptoms" or "moderate difficulty in social or occupational functioning," while a score from 61 to 70 indicates the presence of only "mild symptoms" or "some difficulty in social, occupational, or school functioning." Am. Psychiatric Ass'n, <u>Diagnostic & Statistical Manual of Mental Disorders</u> 32-34 (4th ed. 2000).



written form. Ms. Markley noted that Plaintiff worked slowly on written assignments, but if given the opportunity to answer questions orally or use technology, he did not have a problem. Although Plaintiff had anger issues, his medication kept him calm. Plaintiff slept in class on a daily basis in the fall, but his pattern improved and he was calmer and produced more work after he was medicated. Ms. Markley noted that Plaintiff was bright, had an interest in details, and would read and research with a passion if motivated. Plaintiff read at a tenth grade level and did math on a seventh grade level. (R.pp. 155-162).

Records from Lexington MHC in June 2009 indicate that Plaintiff's was doing "ok" with a GAF of 55, although his sleep was noted to be erratic because he was taking his medications less frequently. (R.pp. 328-329).

On July 28, 2009, Plaintiff underwent a consultative psychological examination with Dr. A. Nicholas DePace. Plaintiff was not on his medication at the time of the examination because it was summer and he was not attending school. Results of the Wechsler Adult Intelligence Scale-Fourth Education were Full Scale IQ score of 77, which was classified in the borderline range. Dr. DePace's diagnostic impressions were ADHD, combined type; probable conduct disorder, rule out impulse control disorder (pyromania); spelling disorder; and arithmetic disorder. Plaintiff was noted to be quite socially inappropriate; he and his mother described numerous behaviors consistent with conduct disorder and impulse control problems; and achievement scores suggested likely learning disabilities with both spelling and arithmetic, although Plaintiff's reading recognition appeared to be in the average range. Plaintiff reported he socialized with a couple of friends, cleaned house, washed dishes, took out the trash, did yard work, fed the family's dogs and cats, cooked simple meals, and read mystery and fantasy novels. Dr. DePace noted that Plaintiff had significant distractibility as well



6

as impulsivity which at times prevented him from performing activities of daily living in the efficient manner than most other young people of his age could do with no problems; his social skills appeared to be quite limited due to difficulties with impulsivity and hyperactivity as well as inattention; his computation abilities were quite limited; he was able to perform three-step commands, although at times he became quite distractible; and his tolerance of frustration was limited at times, although Dr. DePace thought Plaintiff might function quite differently when he was on his ADHD medication. (R.pp. 312-316).

Lexington MHC records from September 2009 indicate that Plaintiff was doing very well with no complaints of aggressive behavior, he had a good initial start to the school year, and his mood was stable. (R.pp. 330-331). In March 2010, a couple of months after Plaintiff turned eighteen, it was noted that Plaintiff rarely took his Seroquel, he only took Vyvanse on school days, he was on the A/B honor roll for the first nine weeks, and had no specific complaints. However, despite these positive observations and a lack of negative ones, Plaintiff's GAF was assessed as 45.[6] (R.pp. 332-333). Plaintiff was treated for sinobronchitis on January 1, 2010 at Lexington Medical Center. He was prescribed an antibiotic and advised not to smoke (he smoked five cigars daily). (R.p. 319). On May 13, 2010, Plaintiff was doing well overall except for ongoing issues with being bulled at school. His sleep was noted to be good and his GAF was assessed at 50. (R.pp. 334-335).

---

[6]"A GAF score of 41 to 50 is classified as reflecting 'serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job.)'". Boyd v. Apfel, 239 F.3d 698, 702 (5th Cir. 2001).

On May 21, 2010, an Individualized Education Program (IEP) and a Functional Behavior Assessment and Behavior Intervention Plan (FBA&BIP) were completed.[7]  The minutes from the IEP meeting indicate that Plaintiff had some anger issues, but had a pretty decent school year; he was very respectful to Mrs. Myrick (a teacher); he fell asleep in class, but when awake and alert he added something to the discussion; he liked to work and went far beyond what was required especially in History class; he was very much an auditory learner; there was supervised job training in eleventh grade and Plaintiff could be employed in twelfth grade; and Plaintiff worked well on a computer, did well in business class, and was very mature and good with adults.  Plaintiff's classification level was noted to be mainly because of his low tolerance for the aggravation of others; his math assessment was at a seventh grade level and his reading at a ninth to tenth grade level; and although Plaintiff worked slower, it was because he was very meticulous and liked his work to be well done.  Plaintiff was also doing well in ROTC class.  Behaviors to be targeted included work completion (especially when Plaintiff's medication was inconsistent), inappropriate expression of anger and frustration, sleeping, and Plaintiff's possession of an alcohol flask at school.  Plaintiff had more difficulty with behavior when he did not sleep well the previous night.  It was noted that before he could become employable, he would need to control his verbal comments and moderate behavior as his comments might be very offensive and prejudicial, especially towards women.  Although Plaintiff had a severe and significant writing disability which frustrated him (and for which he would

---

[7]An IEP is an education plan tailored to a child's unique needs that is designed by the school district in consultation with the child's parents after the child is identified as eligible for special-education services. See 20 U.S.C. §§ 1412(a)(4), 1414(d). "The functional behavior assessment examines the content, pattern, and function of the student's behavior. The IEP then uses this assessment to develop an effective behavior implementation plan, which sets forth appropriate behavior goals and strategies for achieving those goals." Y.B. v. Board of Educ. of Prince George's County, 895 F.Supp.2d 689, 695 n. 5 (D.Md. 2012).



responsively go to sleep), he worked well on a laptop which reduced his level of frustration, he was very verbal, and he had a good sense of general information. (R.pp. 338-354).

On June 3, 2010, at the end of the tenth grade, Ms. Markley completed a questionnaire in which she noted that Plaintiff was reading at a ninth grade level and doing math at a sixth grade level. Plaintiff had only slight problems in acquiring and using information except that he had an obvious problem in expressing ideas in written form and was noted to be very rigid and biased in his thought processing. He had some obvious problems in attending and completing tasks including problems refocusing to task, carrying out multi-step instructions, organizing his own things or school materials, completing class/homework assignments, completing work accurately without careless mistakes, and working without distracting himself or others, and a very serious problem working at a reasonable pace or finishing on time. Ms. Markley noted that Plaintiff basically worked when he wanted to do so and was difficult to motivate. Plaintiff had no problems to only slight problems with respect to interacting and relating to others, except he had a serious problem expressing anger appropriately. He had no problems moving about and manipulating objects. Plaintiff had obvious to serious problems caring for himself, based on his habit of "picking sores" on his arms and face which he did not stop doing when asked. He was often drowsy and was known to sleep deeply in class. He was noted to be "subtly defiant - very opinion[at]ed and biased towards diversity & women." Ms. Markley noted that although Plaintiff needed to learn job skills, he did not want "his check to be stopped." (R.pp. 178-185).

On July 1, 2010 (the same month Plaintiff was found to be not disabled under the adult rules), state agency physician Dr. Janet Boland completed Psychiatric Review Technique and Mental Residual Functional Capacity Assessment forms. Dr. Boland opined that Plaintiff had mild



9

restrictions in his activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration. She thought Plaintiff's allegations of disabling mental impairments were only partially credible and that his current functional limitations did not appear to be of sufficient magnitude so as to preclude the ability to do all forms of work. Dr. Boland noted that Plaintiff's condition improved with medication and treatment; his MHC visits indicated he was doing well with medical management; third party evidence indicated he was doing better; he cared for his daily needs, shopped, and played video games; he performed relatively well in school; he could relate well with adults (although he was noted to have limited frustration tolerance with young children and some peers); and he retained the mental capacity necessary to perform simple, unskilled work-related activities. Dr. Boland rated Plaintiff as not significantly to only moderately limited in the areas of understanding and memory, sustained concentration and persistence, social interaction, and adaptation. She concluded that due to his mental condition, Plaintiff might have difficulty sustaining concentration and pace on complex tasks; but that he should be able to attend to and perform simple tasks without special supervision; he could attend work regularly, but might miss an occasional day due to his mental conditions; he could relate appropriately to supervision and co-workers, but might be better suited to jobs that did not require regular work with the general public; and he could make simple work-related and occupational adjustments, adhere to basic standards for hygiene and behavior, protect himself from normal work-place safety hazards, and use public transportation. (R.pp. 366-383).

On July 22, 2010, Lexington MHC records indicated that Plaintiff was more moody and irritable with increased agitation, mainly directed toward his older bother, but he had not been



10

taking his Seroquel or Vyvanse. His GAF was assessed as 50. (R.pp. 390-391). In September 2010, Plaintiff's GAF was assessed as 50 and he was noted to have some problems with irritability and temper control. Plaintiff reported that his medications were helpful. (R.pp. 392-393). In November 2010, it was noted that Plaintiff was doing very well overall with better sleep and good school behavior. He loved ROTC, had no aggressive behavior, and his GAF was 50. (R.pp. 394-395).

Another IEP with a FBA&BIP, very similar to the one completed in May 2010, was completed on November 17, 2010 (midway through eleventh grade). There was a need to adjust and add goals to the IEP based on Plaintiff's transfer of high schools (from Gilbert High School to White Knoll High School). It appears that a writing goal was added as well as the strategy of monitoring classroom behavior and providing feedback as to impulse/anger control and decision making. It was noted that they would work with Plaintiff's mother to develop a better sleep schedule for him. Coach Williams and First Sergeant Pelley reported that Plaintiff did great in their classes. (R.pp. 238-251, 453-459).

Lexington MHC records in January 2011 indicated that Plaintiff was doing very well except for some impulsive behavior at home mainly directed at his parents, his school behavior had been good, and his GAF was 50. (R.pp. 396-397). Plaintiff was treated at Lexington Medical Center Emergency Department for ear and upper respiratory tract infections on January 26, 2011. (R.pp. 470-480). Lexington MHC notes indicate Plaintiff was doing well despite not taking Seroquel in April 2011. (R.pp. 460-461).

On March 14, 2011, state agency psychologist Dr. Edward Waller completed a Psychiatric Review Technique form and a Mental Residual Functional Capacity Assessment. As had Dr. Boland, Dr. Waller opined that Plaintiff had only mild restrictions in his activities of daily living;



with moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration. Dr. Waller's mental conclusions included that Plaintiff's mental impairments appeared to be only partially credible; and that while Plaintiff was diagnosed and treated for ADHD as well as mood and impulse control disorder, his functional limitations did not appear to be of sufficient magnitude to preclude the ability to do all forms of work. Evidence indicated Plaintiff's condition improved with medication and treatment; his most recent MHC visits indicated he was doing well with medication management; third party evidence indicated he was doing better; he could care for his daily needs, shop, and play video games; he performed relatively well at school; he was able to relate well with adults (although he had limited frustration tolerance with young children and peers); and he retained the mental capacity (despite his combination of mental impairments) to perform simple, unskilled work-related activities. Plaintiff's mental RFC was assessed as not significantly limited to at most moderately limited. Dr. Waller opined that Plaintiff might have difficulty sustaining concentration and pace on complex tasks, but should be able to attend to and perform simple tasks without special supervision; should be able to attend to and perform simple tasks without special supervision; could attend work regularly, although he might miss an occasional day due to his mental condition; could relate appropriately to supervisors and co-workers, but might be better suited to jobs that did not require regular work with the general public; and could make simple work-related decisions and occupational adjustments, adhere to basic standards for hygiene and behavior, protect himself from normal work-place safety hazards, and use public transportation.  (R.pp. 398-411).

Another IEP with a FBA&BIP was completed in May 2011.  Plaintiff had only had only one disciplinary write up for the 2010-2011 year (which was associated with disrespectful



12

behavior). Comments in the academic and functional strengths and needs portion of the report included that Plaintiff worked hard during the year and showed improvement, he still wrote slower than his peers and had errors in spelling and capitalization, and he worked on his social interactions with others and made significant improvements. Plaintiff's control over his anger was getting better, he still struggled with some social interactions (he could come off as being rude when that was not his intent), he needed to learn to moderate his comments, and had some inappropriate behaviors (more prominent when he was feeling stressed) such at picking at scabs and putting his fingers in his mouth. Accommodations were to include extended time to complete assignments and tests, a copy of class notes, use of a laptop if possible, and a place of time-out to calm down and reorganize his thoughts (if frustrated). (R.pp. 416-436).

In June 2011, records from Lexington MHC indicate that Plaintiff was very impulsive, reactive, and quick to anger. A trial of Wellbutrin was prescribed. (R.pp. 462-463). In September 2011, he had still not started Wellbutrin, and the treatment plan was to begin the medication. By December 2011, Lexington MHC records indicate that Plaintiff was doing better overall and his school reports were improved, but he got very agitated with his father and could be very explosive at times. Plaintiff's Wellbutrin dosage was increased. (R.pp. 466-467). Plaintiff was treated at Lexington Medical Center for pneumonia in February 2012. (R.pp. 483-493).

The May 2012 IEP with FBA&BIP noted that Plaintiff had had a good year and usually worked hard in class, although he could easily be distracted and worked at a slower pace. His post secondary goal was to work as a custodian and receive additional training and support through Vocational Rehabilitation. Although Plaintiff occasionally made inappropriate comments, his overall behavior had been appropriate. His only problem had been sleeping in class on occasion. Plaintiff's



13

interactions were improved and his control over his anger was much better. He still struggled with some social interactions and could be considered rude when that was not his intent, but he had gotten better with his comments. He controlled his picking at his skin more and more as the year progressed. Plaintiff maintained ratings of nine on the target behaviors for the 2012/2013 school year. (R.pp. 216-233).

In July 2012, Lexington MHC notes indicated that Plaintiff had been doing better, but he was off his medications due to lack of insurance and had recently been more impulsive and easily agitated. His GAF was assessed at 60. (R.pp. 468-469).

### Listings Analysis

Plaintiff initially asserts that he met or medically equaled a Listing. However, the ALJ specifically considered whether Plaintiff met or equaled Listings 12.02 (Organic Mental Disorders), 12.06 (Anxiety Related Disorders), and 12.08 (Personality Disorders), and found that Plaintiff did not meet or equal the "B" or "C" criteria of any of these listings.[8]

Listing 12.02 (Organic Mental Disorders) provides:

Psychological or behavioral abnormalities associated with a dysfunction of the brain. History and physical examination or laboratory tests demonstrate the presence of a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

---

[8]As noted, Plaintiff's claim for disability as a child was determined based on a different standard than the adult standard applied to this application for benefits. If a child has an impairment that meets, medically equals, or functionally equals the requirements of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"), he is presumptively disabled. See 20 C.F.R. § 416.924(d). An adult is found disabled only if he has an impairment(s) that meets or equals one of the Listings. See 20 C.F.R. § 416.920(a)(iv)(3).



A. Demonstration of a loss of specific cognitive abilities or affective changes and the medically documented persistence of at least one of the following:

   1. Disorientation to time and place; or

   2. Memory impairment, either short-term (inability to learn new information), intermediate, or long-term (inability to remember information that was known sometime in the past); or

   3. Perceptual or thinking disturbances (e.g., hallucinations, delusions); or

   4. Change in personality; or

   5. Disturbance in mood; or

   6. Emotional lability (e.g., explosive temper outbursts, sudden crying, etc.) and impairment in impulse control; or

   7. Loss of measured intellectual ability of at least 15 I.Q. points from premorbid levels or overall impairment index clearly within the severely impaired range on neuropsychological testing, e.g., the Luria–Nebraska, Halstead–Reitan, etc.;

AND

B. Resulting in at least two of the following:

   1. Marked restriction of activities of daily living; or

   2. Marked difficulties in maintaining social functioning; or

   3. Marked difficulties in maintaining concentration, persistence, or pace; or

   4. Repeated episodes of decompensation, each of extended duration;

OR

C. Medically documented history of a chronic organic mental disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

   1. Repeated episodes of decompensation, each of extended duration; or

   2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

   3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. pt. 404, subpt. P, app. 1, § 12.02.

Listing 12.06 (Anxiety Related Disorders) provides:

In these disorders anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders.

15

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied.

 A. Medically documented findings of at least one of the following:

 1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:

  a. Motor tension; or

  b. Autonomic hyperactivity; or

  c. Apprehensive expectation; or

  d. Vigilance and scanning;

 or

 2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or

 3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or

 4. Recurrent obsessions or compulsions which are a source of marked distress; or

 5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;

 And

 B. Resulting in at least two of the following:

 1. Marked restriction of activities of daily living; or

 2. Marked difficulties in maintaining social functioning; or

 3. Marked difficulties in maintaining concentration, persistence, or pace; or

 4. Repeated episodes of decompensation, each of extended duration.

 OR

 C. Resulting in complete inability to function independently outside the area of one's home.

20 C.F.R. pt. 404, subpt. P, app. 1, § 12.06.

Finally, Listing 12.08 (Personality Disorders) provides:

A personality disorder exists when personality traits are inflexible and maladaptive and cause either significant impairment in social or occupational functioning or subjective distress. Characteristic features are typical of the individual's long-term functioning and are not limited to discrete episodes of illness.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied.

 A. Deeply ingrained, maladaptive patterns of behavior associated with one of the following:

 1. Seclusiveness or autistic thinking; or

 2. Pathologically inappropriate suspiciousness or hostility; or

 3. Oddities of thought, perception, speech and behavior; or

 4. Persistent disturbances of mood or affect; or



5. Pathological dependence, passivity, or aggressivity; or
6. Intense and unstable interpersonal relationships and impulsive and damaging behavior;

AND

B. Resulting in at least two of the following:
1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. pt. 404, subpt. P, app. 1, § 12.08.

Plaintiff argues that he meets the "B" criteria as to marked difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace, although he does not actually specify which particular Listing he believes he meets or equals. In support of this claim, Plaintiff points out that he was in "self-contained" classrooms since fourth grade due to behavioral problems and an inability to focus. He also argues, citing to exhibit 18F of the record (R.pp. 453-459 -the FBA&BIP from November 2010), that marked difficulties are supported by testimony from Plaintiff's school psychologist, Leah Tudor. He claims that Ms. Tudor found him to be disabled as a result of his mental impairments and consequently unable to work, and that she documented Plaintiff's long history of disruptive classroom behavior, severe learning disabilities, and inability to socially interact with his peers. However, even assuming (without deciding) that Plaintiff meets the "A" section of any of these Listings, the ALJ's determination that Plaintiff did not meet the "B" section (which is the same in each of the three Listings) of any of these Listings (and thus does not meet or equal any of these Listings) is supported by substantial evidence. Sullivan, 493 U.S. at 530 ["For a claimant to show that his impairment matches a Listing, he must show that it meets *all* of the specified criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify."]; see also Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) [The mere



17

presence of impairments does not automatically entitle a claimant to disability benefits, there must be a showing of related functional loss].

First, the ALJ's determination that Plaintiff had no more than moderate difficulties in social functioning is supported by substantial evidence. As noted by the ALJ, Plaintiff enjoyed talking with his friends and playing video games, and was able to make his own purchases. (R.p. 14). Additionally, the school psychologist at Gilbert High School noted that he enjoyed interacting with Plaintiff and that Plaintiff was not a rule breaker. (R.p. 339). School records also indicated that although Plaintiff got annoyed with younger students at school, he was very respectful and very mature and good with adults. (R.pp. 338-339, 399, 410). Further, at his Lexington MHC appointments, Plaintiff was consistently noted to be cooperative with an appropriate affect and normal mood. (See, e.g., R.pp. 332, 334, 390, 392, 394, 396, 466, 468). See Trenary v. Bowen, 898 F.2d 1361, 1364 (8th Cir. 1990) [Courts should properly focus not on a claimant's diagnosis, but on the claimant's actual functional limitations]. The ALJ's determination is also supported by the findings of the state agency physicians, both of whom opined that Plaintiff was no more than moderately limited in the area of social interaction and, as to the "B" criteria of the Listings, had no more than moderate difficulties in social functioning. (R.pp. 376, 380-381, 408, 412-413). See Smith v. Schwieker, 795 F.2d 343, 345 (4th Cir. 1986) [opinions of non-examining physicians can constitute substantial evidence to support the decision of the Commissioner]; SSR 96-6p [Agency physicians are experts in the evaluation of medical issues for purposes of disability claims].

The ALJ's determination that Plaintiff had no more than moderate difficulties in maintaining concentration, persistence, or pace is also supported by substantial evidence. It was specifically noted by the ALJ that Plaintiff watches two to three DVDs each day at home, enjoys

18

watching sports on television, and is able to comprehend instructions and respond appropriately. (R.p. 15). The ALJ's decision is also supported by the notes from Plaintiff's treating provider (Lexington MHC) indicating that Plaintiff did well with medication management and did relatively well at school (R.pp. 328, 330, 399, 410). School records indicated that Plaintiff liked to do school work, worked well on a computer, and did well in his ROTC and business classes. (R.pp. 338, 410, 340, 410). A report card from the tenth grade indicated that his final grades ranged from 79 to 96 (R.p. 361), and he reportedly made the A/B honor role in 2010 (R.p. 332). None of Plaintiff's treating or examining physicians placed any restrictions on his ability to perform the physical or mental requirements of work as found in the ALJ's RFC, or opined that he was disabled. See Lee v. Sullivan, 945 F.2d 687, 693 (4th Cir. 1991)[finding that no physician opined that claimant was totally and permanently disabled supported a finding of no disability]; see also Craig v. Chater, 76 F.3d 589-590 (4th Cir. 1996)[Noting importance of treating physician opinion]; Richardson v. Perales, 402 U.S. 389, 408 (1971) [assessments of examining, non-treating physicians may constitute substantial evidence in support of a finding of non-disability]. The ALJ's determination is also again supported by the findings of the state agency physicians, who opined on Plaintiff's mental RFC assessments that Plaintiff was no more than moderately limited in the area of sustained concentration and persistence and, as to the "B" criteria of the Listings, had only moderate difficulties in maintaining concentration, persistence, or pace. (R.pp. 376, 380-381, 408, 412-413).

Contrary to Plaintiff's argument, there is no indication that school psychologist Tudor found Plaintiff disabled. Plaintiff has not identified what statement(s) by Ms. Tudor are opinions of disability. The FBA&BIP, which was signed by the "Minutes Recorder" (who appears to be the Assistant Principal), notes that Ms. Tudor as well as a number of Plaintiff's teachers, Plaintiff, and

19

the Assistance Principal were in attendance at the meeting. The report references Ms. Tudor specifically only to note that she explained the purpose for the meeting (that an adjustment in goals was needed from those Plaintiff had at Gilbert High). Although the report indicates that Plaintiff's "current placement" was "emotionally disabled" (R.p. 453) and that his "primary disability" was "emotional disability" (R.p. 459), these designations refer to Plaintiff's placement in special education. Cf. McGrew ex rel. K.M. v. Colvin, No. 13–237, 2014 WL 68766 (E.D.La. Jan. 8, 2014) ["A finding of a marked limitation is not mandated simply because the child functions better with placement in special education classes or other supports."] (citing Richardson v. Barnhart, 136 F. App'x 463, 466 (3d Cir.2005); 20 C.F.R. § 416.924a(b)(7)). Further, although there is a comment about Plaintiff needing to learn to control his verbal comments and moderate his behavior before he could become employable, later reports indicate his behavior improved, with the May 2012 IEP noting that "overall [Plaintiff's] behavior has been appropriate." (R.p. 218). The ALJ also acknowledged that Plaintiff had a history of some attitude and behavior problems which limited his ability to act with the general public, and included this restriction in his RFC. That does not, however, mean that Plaintiff is disabled from all work activity. Trenary, 898 F.2d at 1364 [Courts should properly focus not on a claimant's diagnosis, but on the claimant's actual functional limitations]. That the IEPs were considered by the ALJ is also indicated by the ALJ's detailed discussion of the state agency Disability Hearing Officer's Decision (which considered Plaintiff medical and school reports and Plaintiff and his mother's testimony).[9] (R.pp. 16-17, 71-78).

---

[9]Notably, although SSR 09-2p addresses determinations of childhood disability, it is also instructive as to the use of an IEP, providing that:

"[an] IEP can provide useful information about a child's functioning. However, the underlying purpose of [this document] is not to determine disability under [SSA]

(continued...)



Plaintiff also appears to complain that in reaching his decision, the ALJ did not discuss *every* medical record submitted. However, that is not a requirement. Dryer v. Barnhart, 395 F.3d 1206, 1211(11th Cir. 2005) [ALJ not required to specifically refer to every piece of evidence in the decision]. Rather, what is required is that the ALJ review the medical records and set forth a rationale for his decision that is supported by substantial evidence in the case record. Carlson v. Shalala, 999 F.2d 180, 181 (7th Cir. 1993) [". . .What we require is that the ALJ sufficiently articulate his assessment of the evidence to 'assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of the ALJ's reasoning.'"]; Stephens v. Heckler, 766 F.2d 284, 287 (7th Cir. 1985) [ALJ's discussion of evidence need only be sufficient to "assure [the court] that [he] considered the important evidence . . . [and to enable the court] to trace the path of [his] reasoning"]. An ALJ is not required to provide a written evaluation of every piece of evidence, but need only "minimally articulate" his reasoning so as to "make a bridge" between the evidence and his conclusions. Fischer v. Barnhart, 129 F. App'x. 297, 303 (7th Cir. 2005) (citing Rice v. Barnhart, 384 F.3d 363, 371 (7th Cir. 2004)); Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000) ["ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered"] (citations omitted).

That is what the ALJ did in this case, and this Court may not overturn a decision that is supported by substantial evidence just because the record may contain conflicting evidence. Smith

---

[9](...continued)
rules. Rather, the [] IEP is used to design the individualized services and supports a child needs to maximize growth and development or to participate in and progress in the general education curriculum. In contrast, [the SSA uses] the information in the [] IEP to help determine if the child has marked and severe functional limitations.

SSR 09-2p.

v. Chater, 99 F.3d 635, 638 (4th Cir. 1996) ["The duty to resolve conflicts in the evidence rests with the ALJ, not with a reviewing court"]; see also Hays, 907 F.2d at 1456 [It is the responsibility of the ALJ to weigh the evidence and resolve conflicts in that evidence]; Bowen v. Yuckert, 482 U.S. 137, 146 (1987)[Plaintiff has the burden to show that he has a disabling impairment]; Clarke v. Bowen, 843 F.2d 271, 272-273 (8th Cir. 1988)["The substantial evidence standard presupposes . . . a zone of choice within which the decision makers can go either way without interference by the Courts"]. Therefore, Plaintiff's claim that the ALJ erred in failing to find that he met the criteria of a Listing in the Listings of Impairments is without merit. Sullivan, 493 U.S. at 530 ["For a claimant to show that his impairment matches a Listing, he must show that it meets *all* of the specified criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify."].

### Credibility

Plaintiff alleges that the ALJ erred in holding that Plaintiff's statements about the intensity, persistence, or limiting effects of his symptoms were not credible. He contends that the medical records substantiate his statements and show he suffers from serious conditions that significantly limit his abilities to perform daily tasks and work activities. In particular, Plaintiff argues that Dr. DePace's psychological evaluation confirmed Plaintiff's long history of behavioral problems that resulted in a marked difficulty with social functioning and confirmed that "significant distractibility" prevented him from performing "activities of daily living in an efficient manner." Additionally, Plaintiff argues that his credibility is supported by his receipt of SSI as a child under eighteen due to behavioral problems, and by his placement in a self-contained classroom after fourth grade due to his behavior and concentration issues. In his reply brief, Plaintiff argues that the ALJ failed to present any legitimate reason for not finding him to be entirely credible, allegedly focused

on a few instances when he demonstrated normal social functioning, and "seemingly ignored the overwhelming quantity of reports and testimony regarding Plaintiff's significant and documented history of aggressive and inappropriate social behavior." Plaintiff Reply Brief, ECF No. 10 at 2. These arguments are without merit.

The ALJ noted Plaintiff's own testimony at the hearing was inconsistent with a finding of disability.  See Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1993) [ALJ may properly consider inconsistencies between a plaintiff's testimony and the other evidence of record in evaluating the credibility of the plaintiff's subjective complaints].  Plaintiff testified that on a daily basis he took a shower, read a Greek mythology-based book for at least twenty minutes at a time, cleaned the house, took care of seven dogs (including three puppies), played video games with his older brother, washed dishes, made some meals, went for walks, did yard work, watched sports and game shows, and watched two to three DVDs a day. (R.pp. 33-36).  He testified that he tried applying for a janitorial position at his high school, did not get the job, but was still trying to get the job and thought that he could do such a job. (R.p. 37).  Plaintiff also testified that he worked the previous summer (under the table) as a farm hand and was able to do the work for about three months until the seasonal work ended. (R.pp. 38-39).  This testimony contradicts Plaintiff's claim that he is markedly limited in his actions of daily living, social functioning, or in his ability to concentrate. See Johnson v. Barnhart, 434 F.3d 650, 658 (4th Cir. 2005)[Accepting ALJ's finding that claimant's activities were inconsistent with complaints of incapacitating limitations where she engaged in a variety of activities]; Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001).

Additionally, although Plaintiff argues that Dr. DePace's report contradicts the ALJ's credibility finding, Dr. DePace concluded that Plaintiff could perform three-step commands.  Dr.



23

DePace further hypothesized that Plaintiff, who was not on his ADHD medication at the time of the consultative examination, might perform differently if he was taking his medication. (R.p. 316). Indeed, this conclusion is supported by the records from Lexington MHC and Plaintiff's school records, which indicate that Plaintiff performed better when taking his ADHD medication. Plaintiff was also able to perform at a reasonable level at school, as is evidenced by his grades and A/B honor roll achievement and that he was in the ROTC, all of which was noted by the ALJ in his decision. (R.pp. 15-18). While Plaintiff points to examples he believes support his claims, it is the job of the ALJ to weigh and assess contradictory evidence in making a decision on the claim presented. Hays, 907 F.2d at 1456 [It is the responsibility of the ALJ to weigh the evidence and resolve conflicts in that evidence]. The ALJ is tasked with considering the entire record when reaching a decision, and that is what the ALJ did in this case. See SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996) [Where a claimant seeks to rely on subjective evidence to prove the severity of her symptoms, the ALJ "must make a finding on the credibility of the individual's statements, based on a consideration of the entire case record."]; Mickles v. Shalala, 29 F.3d 918, 925-926 (4th Cir. 1994) [In assessing the credibility of the severity of reported subjective complaints, consideration must be given to the entire record, including the objective and subjective evidence].

The ALJ did not conduct an improper credibility analysis, nor does his decision reflect a failure to properly consider the affect Plaintiff's impairments had on his ability to work. Smith, 99 F.3d at 638 ["The duty to resolve conflicts in the evidence rests with the ALJ, not with a reviewing court"]. Therefore, this claim is without merit. Craig, 76 F.3d 595 ["Although a claimant's [subjective] allegations . . . may not be discredited solely because they are not substantiated by objective evidence . . . , they need not be accepted to the extent they are inconsistent with the

24

available evidence, including objective evidence of the underlying impairment."]; Guthrie v. Astrue, No. 10-858, 2011 WL 7583572, at * 8 (S.D.Ohio Nov. 15, 2011)["[I]t is proper for an ALJ to discount the claimant's testimony where there are contradictions among the medical records, or testimony, and other evidence"]; Kellough v. Heckler, 785 F.2d 1147, 1149 (4th Cir. 1986) ["If the Secretary's dispositive factual findings are supported by substantial evidence, they must be affirmed, even in cases where contrary findings of an ALJ might also be so supported."] (citation omitted)].

### VE/ Conflict with DOT

Plaintiff's final claim is that the ALJ gave improper weight to the VE's testimony because the VE failed to place the proper amount of weight on Plaintiff's inability to persist at tasks, his inability to follow more than very simple instructions, and his inability to socially interact or be part of a "team." Plaintiff claims that "the vast majority of the jobs available in these positions in the national economy requires one, if not all, of the traits that the Plaintiff is lacking; a "team" environment would undoubtedly be present in many of the general laborer positions, as well as in the hand packer and laundry laborer positions." Plaintiff's Brief, ECF No. 8 at 5. He further argues that he would not be able to perform this work because he was "unable to concentrate and is unable to follow more than the most basic set of instructions." Id. at 5-6.

As noted above, the ALJ found that Plaintiff had the RFC to perform the full range of work at all exertional levels with the nonexertional limitations of simple, routine tasks; no reading or writing beyond unskilled level; a supervised environment; and no required interaction with the public or type-type interaction with co-workers. (R.p. 15). In order for a VE's opinion to be helpful and relevant, it must be "in response to proper hypothetical questions which thoroughly set out all of claimant's impairments" Walker v. Bowen, 889 F.2d 47, 49 (4th Cir. 1989); see also Hargis v.



25

Sullivan, 945 F.2d 1482, 1492 (10th Cir. 1991) [hypothetical question submitted to the VE must state the claimant's impairments with precision]. Here, the ALJ did so, asking the VE to consider a claimant of Plaintiff's age, education, and past job experience who was limited to

> simple routine tasks; no reading or writing beyond the unskilled level; in a supervised environment, and by that I mean there [would] be a working supervisor typically in the area, certainly not sheltered work . . . there would be no required interaction with the public or team type interaction with coworkers.

(R.p. 41). In response, the VE identified occupations existing in significant numbers that Plaintiff could perform. (R.pp. 41-42).

Plaintiff hypothesizes that the jobs identified by the VE involve tasks exceeding his RFC, but has not pointed to any supporting evidence. In his reply brief, Plaintiff argues that there is a conflict between the VE's testimony and the Dictionary of Occupational Titles (DOT)[10] because the VE's description of interacting with people is only based on taking instructions for the work assignment at hand, but does not address whether the worker will be expected to be a part of a "team environment." However, the ALJ (in compliance with SSR 00-4p) asked the VE if there was any conflict between the DOT and the individual jobs cited, to which the VE responded that there was no conflict. (R.p. 42). Plaintiff appears to argue that there is a conflict because, although the DOT described these jobs as a Level 8 as to people (the lowest category),[11] it was silent as to any team-type

---

[10]The DOT is "a publication of the United States Department of Labor that contains descriptions of the requirements for thousands of jobs that exist in the national economy." Burns v. Barnhart, 312 F.3d 113, 119 (3d Cir. 2002). "[T]he DOT, in its job definition, represents approximate maximum requirements for each position rather than the range." See Fenton v. Apfel, 149 F.3d 907, 911 (8th Cir. 1998).

[11]This is described as "[a]ttending to the work assignment instructions or orders of supervisor. (No immediate response required unless clarification of instructions or orders is needed.) Helping applies to "non-learning helpers." DICOT Appendix B, 1991 WL 688701.


p 26

requirements. As noted above, however, the VE testified that there was no conflict with the DOT. Wilson v. Califano, 617 F.2d 1050, 1053 (4th Cir. 1980)[ALJ may rely on VE opinion based on training, experience and familiarity with skills necessary to function in various jobs]. Moreover, courts have found that no conflict with the DOT exists when the DOT job description did not include a provision that was actually incompatible with the RFC the VE relied on, but rather was simply silent or unclear as to one of the RFC's limitations. See Zblewski v. Astrue, 302 F. App'x 488, 494 (7th Cir.2008) [holding that VE's testimony was not in apparent conflict with DOT as DOT did not address sit/stand options, and thus ALJ did not err in failing to inquire into such]; see also Wait v. Colvin, C.A. No. 1:13–cv–1363–TMC, 2014 WL 2979797, at *4 (D.S.C. June 27, 2014); Conn v. Astrue, 852 F.Supp 2d. 517, 528-529 (D.Del. 2012).

Plaintiff also argues that there is a conflict between the VE's testimony and the DOT because a handpacker (which has a reasoning level of 2) would be expected "to carry out detailed but uninvolved written or oral instructions" and to deal with "problems involving a few concrete variables in or from standardized situations." ECF No. 10 at 3, see DICOT 920.587-018. However, although the Fourth Circuit has not addressed this, district courts within this Circuit have found that a claimant limited to work involving simple and repetitive tasks can perform jobs with a reasoning level of two. See, e.g., Marshall v. Colvin, No. 13–1585, 2014 WL 6066008, at *5 (D.Md. Nov. 12, 2014)[limitation to work involving one or two steps did not conflict with the jobs identified by the VE which had a reasoning level of two]; Snider v. Colvin, No. 7:12cv539, 2014 WL 793151, at *7-8 (W.D.Va. Feb. 26, 2014)[unskilled work involving simple instructions is "proportionate to DOT reasoning level two"]; Lindsey v. Astrue, No. 9:10–1079, 2011 WL 2214779, at *3–4 (D.S.C. June 7, 2011)[the VE's testimony and the information in the DOT were generally consistent because even

27

with the plaintiff's RFC limitations of simple, repetitive tasks and instructions, he could perform an unskilled job with a GED reasoning level of 2]; Taylor v. Astrue, No. 5:10–CV–263–FL, 2011 WL 1599679, at *12–13 (E.D.N.C. March 23, 2011)[finding that "a limitation to simple, routine and repetitive tasks is not inconsistent with jobs at the DOT reasoning development level 2"], adopted by, 2011 WL 1599667 (E.D.N.C. Apr 26, 2011). "[A]lthough reasoning level two requires the understanding to carry out detailed instructions, 'it specifically caveats that the instructions would be uninvolved-that is, not a high level of reasoning.'" Pippen v. Astrue, No. 1:09cv308, 2010 WL 3656002, at *7 (W.D.N.C. August 24, 2010) [further noting that "work that requires 'commonsense understanding' is simple. Work that requires 'uninvolved written or oral instructions' is simple and routine"](internal quotations omitted), adopted by, 2010 WL 3655998 (W.D.N.C. Sept. 15, 2010).

In sum, Plaintiff fails to show error as to this issue. The VE is the witness responsible for knowing and applying the DOT and is the expert in job requirements. See Carey v. Apfel, 230 F.3d 131, 145 (5th Cir. 2000)[stating "the DOT job descriptions should not be given a role that is exclusive of more specific VE testimony with respect to the effect of an individual claimant's limitations on his or her ability to perform a particular job"]. Here, the ALJ properly relied on the VE's testimony where he posed a proper hypothetical to the VE, inquired as to any conflicts with the DOT, and the VE identified a significant number of jobs Plaintiff could perform with the limitations included in Plaintiff's RFC. See Walker v. Bowen, 889 F.2d at 49; SSR 00-4p.

### Conclusion

Substantial evidence is defined as "... evidence which a reasoning mind would accept as sufficient to support a particular conclusion." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir.1984). As previously noted, if the record contains substantial evidence to support the decision



(i.e., if there is sufficient evidence to justify a refusal to direct a verdict were the case before a jury), this Court is required to uphold the decision, even should the Court disagree with the decision. Blalock, 483 F.2d at 775.

       Under this standard, the record contains substantial evidence to support the conclusion of the Commissioner that the Plaintiff was not disabled within the meaning of the Social Security Act during the relevant time period. Therefore, it is recommended that the decision of the Commissioner be affirmed.

       The parties are referred to the notice page attached hereto.


Bristow Marchant
United States Magistrate Judge

May 12, 2015
Charleston, South Carolina

29

## Notice of Right to File Objections to Report and Recommendation

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

